UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAYLER BAYER,<br>　　　　Plaintiff,<br>　　v.<br>NEIMAN MARCUS GROUP, INC.,<br>　　　　Defendant. | Case No. 13-cv-04487-MEJ<br><br>**ORDER RE: MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 28, 34 |

## INTRODUCTION

In this action, Plaintiff Tayler Bayer, a former employee of Defendant Neiman Marcus Group, Inc. (NMG), brings a single claim for wrongful interference of his rights under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12203. Pending before the Court are the parties' cross-motions for summary judgment. Pl.'s Mot. for Summ. J. (PMSJ), Dkt. No. 28; Def.'s Mot. for Summ. J. (DMSJ), Dkt. No. 34. The Court finds this matter suitable for disposition without oral argument. Fed. R. Civ. P. 78(b); Civ. L.R. 7-1(b). Having considered the parties' positions, the relevant legal authority, and the record in this case, the Court **DENIES** Defendant's Motion and **DENIES** Plaintiff's Motion for the reasons set forth below.

## BACKGROUND

**A.　Lawsuit #1**

NMG is a national retailer of luxury goods and operates a chain of high-end retail department stores. Joint Statement of Undisputed Facts (JSUF) ¶ 44, Dkt. No. 74. Bayer joined NMG in March 2006; he regularly worked five six-hour shifts in the Cosmetics Department of the San Francisco store as a Product Specialist. JSUF ¶¶ 5, 45.

In March 2007, Bayer was placed on medical leave by his doctor due to respiratory

problems, and remained on FMLA leave for a medical condition through May 2007. JSUF ¶¶ 6, 46. Bayer's physician released him to return to work at the start of June 2007, subject to certain restrictions, including that he work no more than four days per week. JSUF ¶¶ 7-8, 47. Bayer asked NMG to modify his existing 30-hour schedule from five six-hour shifts to four seven-and-a-half hour shifts, which would enable him to continue working 30 hours a week. JSUF ¶ 10. NMG employees who worked an average of at least 30 hours a week were considered full time and eligible to receive certain medical benefits, including medical insurance. JSUF ¶ 4. On or about June 8, 2007, NMG declined to modify Bayer's schedule in the manner requested. JSUF ¶ 11. Instead, NMG allowed Bayer to reduce his days of work from five to four, with intermittent FMLA leave on the fifth day. JSUF ¶ 48. This proposed accommodation would reduce Bayer's weekly hours below 30 per week. JSUF ¶ 49.

Bayer filed an administrative complaint with the EEOC for his reasonable accommodation charge on June 20, 2007. JSUF ¶¶ 13, 53 (EEOC Charge #1). In October 2007, the EEOC issued a right-to-sue letter for Bayer's EEOC Charge #1 (JSUF ¶ 31), and Bayer brought suit against Neiman Marcus in January 2008 (*Tayler Bayer v. Neiman Marcus Holdings, Inc*., N.D. Cal. Case No. CV-08-0480-PJH) (Lawsuit #1) (JSUF ¶ 32). The parties settled Lawsuit #1. JSUF ¶ 69.

**B.   Lawsuit #2**

NMG terminated Bayer's employer in January 2009, after which Bayer filed another EEOC charge, alleging that NMG's termination was in retaliation for his previous EEOC charges. JSUF ¶ 66; Bayer Decl., Ex. O (EEOC Charge #3), Dkt. No. 31.[1] After the EEOC issued a right-to-sue letter with respect to EEOC Charge #3, Bayer filed another federal court lawsuit alleging that Neiman Marcus had wrongfully terminated him in violation of the ADA's anti-retaliation provisions. *Tayler Bayer v. Neiman Marcus Gp., Inc.*, N.D. Cal. Case No. CV-11-03705-MEJ (Lawsuit #2); JSUF ¶ 66.

In Lawsuit #2, Neiman Marcus filed a Motion to Compel Arbitration. JSUF ¶ 67. In

---

[1] As discussed further below, Bayer filed a second EEOC charge before EEOC Charge #3. The EEOC's internal investigation process took several years, such that Bayer did not receive a Right to Sue notice from the EEOC on his second EEOC charge until after he received a Right to Sue notice on his third charge. *See infra* at 3-7.

November 2011, this Court denied Neiman Marcus's motion to compel arbitration on the ground that Bayer had never consented to be bound. JSUF ¶ II.100.[2] Neiman Marcus appealed that order; on July 3, 2014, the Ninth Circuit affirmed the Court's refusal to compel arbitration, holding that Bayer had never consented to be bound by Neiman Marcus's Arbitration Agreement and therefore was not required to arbitrate his claims of unlawful retaliation. *Bayer v. Neiman Marcus Grp., Inc.*, 2014 U.S. App. LEXIS 12645, Ninth Circuit No. 11-17920 (July 3, 2014) (Thomas, McKeown, Kendall, JJ.) (unpub.); JSUF ¶¶ 68, II.100. Lawsuit #2 settled after remand. Lawsuit #2, Dkt. Nos. 54, 56.

## C. Lawsuit #3

The events giving rise to this case occurred around the time Bayer filed his administrative complaint on EEOC Charge #1 for failure to accommodate. On June 11, 2007, NMG mailed a notice informing its employees that it was adopting an alternative dispute resolution (ADR) program called "NMG Resolutions." JSUF ¶ II.7; *see also* Bayer Decl., Ex. I (June 11, 2007 Memorandum "explain[ing] a new program for resolving all workplace disputes"). NMG Resolutions established a dispute resolution process, under which a dispute would proceed to arbitration if it could not be resolved informally. JSUF II.8; June 11, 2007 Memorandum. Bayer received the June 11, 2007 Memorandum; subsequently, on June 20, 2007, he received in the mail a package from NMG explaining that it was adopting a multi-faceted alternative dispute resolution (ADR) program. JSUF ¶¶ 15, 50-52, 54-55, II.10. The NMG package included information on NMG Resolutions. JSUF ¶ 15; *see also* Bayer Decl., Ex. G (NMG Resolutions: A 4-Step Process "NMG 4-Step"). The NMG package also included a Mandatory Arbitration Agreement, which described the terms of the arbitration process. Bayer Decl., Ex. E (the "Arbitration Agreement"). The Acknowledgment Form that accompanied the Arbitration Agreement stated that employees, by signing the form, acknowledged they understood the Arbitration Agreement

---

[2] The parties organized their JSUF into two sections. The first section pertains to facts at issue in Plaintiff's Motion for Summary Judgment; the second section pertains to facts at issue in Defendant's. When referring to JSUF pertaining to Defendant's Motion, the Court will use "II" before indicating the relevant paragraph.

3

> requires me to submit all complaints, disputes, and legal claims ("Disputes") I have against the Company, and the Company to submit **all Disputes** it has against me, to **binding arbitration**. . . both I and the Company are **waiving the right to a trial by jury or to a trial before a judge** in a court of law on all Disputes. Instead, all Disputes must be submitted to final and binding arbitration. . . . [T]he Arbitration Agreement is **not optional**. Rather, it is **mandatory** and a condition and term of my employment if I am employed or continue employment on or after July 15, 2007.

JSUF ¶ 17 (emphases in original); *see also* Bayer Decl., Ex. F (the "Arbitration Agreement Acknowledgment Form"). The Arbitration Agreement reflected the same provisions (without emphases), and also stated: "Each covered employee's employment or continued employment with the Company after the Effective Date constitutes assent, acceptance, consent and consideration for this Agreement to arbitrate, both during the time of employment and after termination of employment." JSUF ¶ 18; *see also* Bayer Decl., Ex. H (Frequently Asked Questions (FAQs) relating to the Arbitration Agreement); JSUF ¶ 19 (FAQs in package reiterated that employees would be deemed to have accepted the terms of the Arbitration Agreement if they continued employment with NMG after July 15, 2007).

Bayer understood the Arbitration Agreement required him and NMG to submit to binding arbitration and to waive the right to a jury trial; he also understood that if he continued to work after July 15, 2007, NMG would consider him subject to the Arbitration Agreement. JSUF ¶ 58.

By July 9, 2007, Bayer had retained an attorney to assist him in responding to NMG's arbitration program; he filed a second EEOC charge against NMG on July 9, 2007 (EEOC Charge #2). JSUF ¶¶ 25-27, II.40; *see also* Bayer Decl., Ex. K (EEOC Charge #2). This second EEOC charge, which gives rise to this lawsuit, alleges that NMG unlawfully limited Bayer's civil rights by requiring him to sign the Arbitration Agreement which contained several illegal provisions, including a prohibition on class actions, a one-year statute of limitations, a limit of three depositions, a requirement that all arbitrators be members of the Texas Bar, and that federal claims be governed by Fifth Circuit law. EEOC Charge #2 further alleges that being required to sign the Arbitration Agreement violates Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, the Equal Pay Act of 1963, and the Americans with Disabilities Act of 1990. *See* Bayer Decl., Ex. K.

Bayer informed NMG during the first half of July 2007 that he would not sign the Acknowledgment Form, would not agree or consent to the Arbitration Agreement, and refused to be bound by the Arbitration Agreement. JSUF ¶¶ 27, 59-62; *see also Bayer* Decl. ¶ 13 & Ex. L (July 10, 2007 letter to NMG expressing Bayer declines to sign or be bound by Arbitration Agreement based on its illegality, and stating: "As you know I have already filed a charge of discrimination with the EEOC which is presently pending. I have also filed a second charge relating to the imposition of this arbitration agreement.").

Bayer testified that two NMG managers, Liza Clay and Lily Tang Lamb, told him that if he did not sign, he could be terminated. Bayer Dep. at 56:8-58:24, 83:1-5, Dkt. No. 35-3; *see also* Bayer Aff. at 2, Dkt. No. 34-6. On June 29th, Clay asked Bayer if he had read the Arbitration Agreement and if he was going to turn in the Acknowledgment Form, then said: "You realize you can be terminated and you are choosing not to be a Neman Marcus employee? Your last day can be July 14." Bayer Dep. at 57:10-25. Clay then stated she would make an appointment for Bayer to meet with Greg Carlson in HR to discuss the Arbitration Agreement; Bayer followed up with Carlson, but the meeting never took place. *Id.* at 57:25-58:5. Clay told Bayer once more in July that he was choosing to not be an employee if he did not sign the forms. *Id.* at 58:6-21. He had a similar conversation with Tang Lamb in July. *Id.* at 60:1-19 (Tang Lamb asked Bayer whether he had signed the form yet, and told him "this is the deadline and you can be terminated"), *id.* at 66:3-22. In addition to the conversations with Clay and Tang Lamb, Bayer testified that HR personnel at NMG asked him where the completed form was "a couple more times." *Id.* at 86:22-87:20. These were the only verbal statements anyone at NMG made to Bayer that he believes were coercive in an attempt to get him to sign the Acknowledgment Form. *Id.* at 87:4-9. Clay and Tang Lamb deny they ever made such representations to Bayer. Clay Decl. ¶ 12, Dkt. No. 34-2; Tang Decl. ¶¶ 9-10, Dkt. No. 34-4; *see also* Hale Decl. ¶¶ 6-9, Dkt. No. 34-3 (describing process NMG HR followed when employees refused to sign Acknowledgment Form, and declaring she "would not have told any employee that they could be terminated if they did not sign the acknowledgement form and do not believe Mr. Carlson would have done so, either.").

No one ordered Bayer to sign the Acknowledgment Form or disciplined him when he

refused. JSUF ¶¶ II.29. Bayer reported to work on July 15, 2007; despite his refusal to sign the Acknowledgment Form and his refusal to be bound by the Arbitration Agreement, Bayer continued to work at NMG until he was terminated in January 2009. JSUF ¶¶ 29, 64, II.99.

Bayer declares his managers never said anything further to him about the Arbitration Agreement after July 15, 2007. Bayer Decl. ¶ 16. On several occasions, however, NMG sent him new forms that referred to the arbitration program, and Bayer refused to sign those forms, too. *Id.*; *see also id.*, Ex. M (Nov. 28, 2007 letter to NMG reiterating refusal and reasons therefore).

The EEOC's investigation into Bayer's EEOC Charge #2 continued for several years. It was not until July 2013, six years after Bayer filed EEOC Charge #2, that the EEOC issued a right-to-sue letter with respect to EEOC Charge #2. JSUF ¶ II.90; Bayer Decl., Ex. Q (the EEOC found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charge).

Bayer filed the present lawsuit, based on EEOC Charge #2, in September 2013 (Lawsuit #3). Lawsuit #3 alleges that Neiman Marcus's insistence in June and July 2007 that he choose between quitting his job and being bound by its Arbitration Agreement violated Section 503(b) of the ADA. JSUF ¶ II.91; *see also* Compl. ¶¶ 28-44, Dkt. No. 1. In addition to damages, Plaintiff sought a declaration that the Arbitration Agreement is "unlawful, invalid and unenforceable" and an injunction to prohibit NMG from coercing employees to waive ADA rights. *Id.* at 23.

The parties initially moved for summary judgment in July 2014. *See* PMSJ; DMSJ. Bayer conceded he no longer needed an injunction in his Opposition. *See* Pl.'s Opp'n at 11, Dkt. No. 36. This Court found the action was moot because Bayer could not obtain any of the remaining relief he requested in Lawsuit #3. *See* Original MSJ Order, Dkt. No. 45. Bayer could only obtain equitable relief under Section 503 and therefore could recover neither compensatory nor nominal damages; he also could not recover out-of-pocket medical or legal expenses as restitution in this case. *Id.* at 7-11. In addition, the Court found legal fees in and of themselves did not resuscitate an otherwise moot controversy. *Id.* at 11. Finally, the Court found declaratory relief was unavailable because Bayer could not show it would serve any useful purpose: Lawsuit #1 was settled, the Ninth Circuit confirmed in Lawsuit #3 that Bayer was not subject to the arbitration

agreement, and Bayer was no longer employed by NMG. *Id.* at 12-13. The Court concluded that although "a live controversy existed between the parties when Bayer filed this case, the subsequent events and changed factual circumstances here have made this case moot." *Id.* at 13. The Court granted Defendant's Motion for Summary Judgment, denied Plaintiff's, and dismissed the action. *Id.* at 14.

Bayer appealed the dismissal of Lawsuit #3. Dkt. No. 48. The Ninth Circuit reversed and remanded on the ground that nominal damages may be awarded as an equitable remedy under Section 503, and that the case accordingly was not entirely moot. Ninth Cir. Op., Dkt. No. 55; *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853 (9th Cir. 2017). The Ninth Circuit otherwise affirmed the undersigned's ruling that all other types of relief requested by Bayer were unavailable to him in this action. *Id.*

The parties disputed the scope and effect of the Ninth Circuit's Opinion. *See* Feb. 2, 2018 Order, Dkt. No. 72. After reviewing the parties' briefs on the issue, the undersigned "conclude[d] that the Ninth Circuit's reversal and remand 'for further proceedings' for the purposes of achieving 'complete justice' requires it to evaluate Bayer's arguments that Neiman Marcus violated his rights under the ADA." *Id.* at 3. The undersigned encouraged the parties to meet and confer and attempt to submit a joint statement of undisputed facts and resolve their evidentiary disputes, and indicated it would decide the issue based on the existing summary judgment briefing. The parties filed the JSUF.[3]

**LEGAL STANDARD**

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that

---

[3] The JSUF lists only the facts the parties stipulated were undisputed. The parties also filed a Joint Separate Statement of Material Facts, which identifies the supporting evidence for the undisputed facts, and also lists all disputed facts the parties contend are material, as well as the evidence in support of those facts. *See* Dkt. No. 73. The Court appreciates the parties' efforts in providing these documents, which eliminated many of the previous evidentiary disputes and allowed the Court to focus more efficiently on the merits of these motions.

7

1 demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 324-25.

If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250. It is not the task of the Court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The Court "rel[ies] on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Id.*; *see also Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010). Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 323 (internal quotations omitted).

**DISCUSSION**

**A.     Arguments of the Parties**

Bayer argues he is entitled to summary judgment as to liability because the undisputed facts establish that NMG violated section 503(b) of the ADA, 42 U.S.C. § 12203(b)), by coercing, intimidating, threatening, and interfering with Bayer's exercise of protected ADA rights. PMSJ at 12-19. Bayer contends NMG interfered with his ADA rights by forcing him to choose between

8

his job or the exercise of his statutory rights to pursue ADA claims before a neutral decision-maker in court, with the right to trial by jury, and to meaningful appellate review.

NMG argues Bayer has failed to establish the elements of an ADA interference claim because he has not established NMG coerced him in, or interfered with, any current exercise or enjoyment of a right granted by the ADA. Specifically, NMG argues that adoption of a mandatory arbitration agreement is consistent with the ADA, and that the Arbitration Agreement does not unlawfully strip Bayer of any ADA rights. NMG argues Bayer has not suffered a distinct and palpable injury as a result of NMG's conduct. NMG also argues Bayer has not met his burden of proving he was disabled.

Bayer asserts he need not prove he is disabled to pursue a Section 503(b) claim. He also argues that NMG's main legal argument rests on "the false assumption" that Bayer's lawsuit challenges nothing more than the validity and enforceability of NMG's arbitration. He contends that under Section 503(b), the issue is not whether the employer's arbitration agreement was enforceable (or would have been enforceable if the employee had agreed to be bound), but whether *its challenged course of conduct* –i.e., Neiman Marcus's alleged efforts to force Bayer to choose between either quitting his job or agreeing to be bound by that restrictive agreement – constitutes the type of coercion, threats, intimidation, or interference that Congress intended to proscribe in Section 503(b). He argues that the Arbitration Agreement was likely to have a chilling effect on the exercise of ADA rights because of its many provisions that strip potential claimants of their rights and remedies.

**B.     Analysis**

1.     ADA Section 503(b)

"It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." 42 U.S.C. § 12203(b). "'Interference' is 'the act of meddling in or hampering an activity or process.' To 'coerce' is 'to compel to an act or choice by force, threat, or other pressure.' . . . [A] 'threat' is 'an expression to inflict evil, injury, or other

9

damage on another.'" *Walker v. City of Lakewood*, 272 F.3d 1114, 1128-29 (9th Cir. 2001) (analyzing meaning of identical terms in Fair Housing Act, and stating elements of retaliation claim under FHA: plaintiff engaged in protected activity; defendant subjected plaintiff to adverse action; a causal link exists between the two).

Because neither the Supreme Court nor the Ninth Circuit has yet outlined a legal test for a Section 503(b) interference claim, the Court ordered the parties to provide supplemental briefing on two issues: (1) whether Section 503(b) required Bayer to show NMG's efforts to have him sign the Arbitration Agreement were causally linked to Bayer's protected conduct, and (2) whether triable issues of fact existed regarding that causal link. *See* Suppl. Br. Order. at 6, Dkt. No. 76. In its Supplemental Briefing Order, the Court observed that

> *Brown v. City of Tucson*, 336 F.3d 1181 (9th Cir. 2003), provides helpful guidance. In *Brown*, the Ninth Circuit found that the anti-interference provision of the ADA and the Fair Housing Act (FHA) were not merely similar, but identical, and that this served as an indication that Congress intended the provisions to be interpreted the same way. *Id.* at 1191 ("[O]ur construction and application of § 503(b) ought to be guided by our treatment of the FHA's interference provision, 42 U.S.C. § 3617, as well as similar provisions in the FMLA and NLRA"). Recognizing the *McDonnell Douglas* burden-shifting framework applies to Section 503(a) retaliation claims, the Ninth Circuit nonetheless reversed a district court's decision to apply the that framework to a Section 503(b) interference claim. *Id.* at 1191-93 (recognizing *Brown's* Section 503(b) claim alleged "only interference, not interference *and* retaliation." (emphases in original) (citing *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001)). Although it recited a causality requirement for Brown's Section 503(a) claim, 336 F.3d at 1186-87, the Ninth Circuit did not clarify – in *Brown* or since – whether an employee can prevail on a 503(b) interference-only claim by showing that the employer has interfered with the enjoyment of a statutorily-protect right, or whether the employee also must establish there is a causal link between the employee's enjoyment of such a right and the employer's conduct. *See id.*; *see Garity v. APWU Nat'l Labor Org.*, 828 F.3d 848, 859 n.9 (9th Cir. 2016) (*Brown* "declin[ed] to apply 'Title VII's burden-shifting or hostile environment frameworks' to plaintiffs claim under 42 U.S.C. § 12203(b) because the Fair Housing Act served as a better textual analog"). The Ninth Circuit recognized that the term "interference" should be given a "broad scope," but that "anti-interference provisions such as those contained in the FHA and ADA cannot be so broad as to prohibit 'any action whatsoever than in any way hinders a member of a protected class.'" *Brown*, 336 F.3d at 1192 (quoting *Mich. Prot. & Advocacy Serv. v. Babin*, 18 F.3d 337, 347 (6th Cir. 1994)). It did not need to resolve the precise definition of interference, coercion, or intimidation, because it found "the plain

10

language of § 503(b) clearly prohibits a supervisor from threatening an individual with transfer, demotion, or forced retirement unless the individual foregoes a statutorily protected accommodation" – which the plaintiff had alleged. *Id.* at 1193 (emphasis added).

Courts in other circuits that have squarely addressed the causality requirement have imposed a causality and/or discriminatory intent element to Section 503(b) claims. *See Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550-51 (7th Cir. 2017) (following *Brown* and using FHA framework to establish legal standard for ADA interference claim: "a plaintiff alleging an ADA interference claim must demonstrate that: (1) she engaged in activity statutorily protected by the ADA; (2) she was engaged in, or aided or encouraged others in, the exercise or enjoyment of ADA protected rights; (3) the defendants coerced, threatened, intimidated, or interfered on account of her protected activity; and (4) the defendants were motivated by an intent to discriminate." (citing *Bloch v. Frischholz*, 587 F.3d 771, 783 (7th Cir. 2009) (en banc) (framework for FHA interference claim)); *Lagervall v. Missoula Cty. Pub. Schs.*, 2017 WL 3610549, at *5 (D. Mont. Aug. 22, 2017) ("Although the Court has not located decisional law within the Ninth Circuit expressly discussing whether section 12203(b) requires that a causal link be shown between a plaintiff's protected conduct and a defendant's unlawful conduct, the Court concludes, by analogy with other federal laws, that section 12203(b) requires a causal link. . . . Because section 12203(b) of the ADA employs language identical to the language in section 3617 of the Fair Housing Act, the Court construes section 12203(b) to impose the same requirement of a causal link between a plaintiff's protected activities and the defendant's alleged wrongful coercive or intimidating conduct. Thus, Lagervall must demonstrate that any alleged coercive or intimidating conduct committed by Missoula Schools was because of his engagement in activities protected under the ADA."); *Kerrigan v. Board of Educ.*, 2015 WL 4591053, at *5 n.20 (D. Md. July 28, 2015) ("Though Kerrigan titled count four as 'retaliation,' he brings his claim under 42 U.S.C. § 12203(b), which governs interference, coercion, or intimidation, not retaliation, which is governed by 42 U.S.C. § 12203(a). However, the elements are the same. *See Bertolotti v. Prunty*, 2010 WL 3743866, at *3 (S.D.W.Va. Sept. 21, 2010)" (applying Fourth Circuit elements of ADA retaliation claim to interference claim, describing how "Dr. Prunty's ridiculing, intimidating, and coercive remarks about Plaintiff's ability to be a nurse coerced Plaintiff from purs[u]ing any reasonable accommodation" and finding this to be an adverse action and that a causal link "clearly exist[ed]" between the protected activity and the retaliatory action because Dr. Prunty's remarks were made immediately after, and in direct response to, Plaintiff informing her that she is hearing impaired")); *Youngblood v. Prudential Ins. Co.*, 706 F. Supp. 2d 831, 838-40 (M.D. Tenn. 2010) (analyzing *Brown* and agreeing that FHA provides relevant framework for Section 503(b) interference claims, and finding that pursuant to Sixth Circuit law, "to rise to the level of actionable interference with plaintiff's ADA-protected rights pursuant to § 12203(b), . . . actions must have been taken because of plaintiff's alleged disability, and not because of their desire to avoid paying benefits to which plaintiff alleges her entitlement, or for any other

11

reason.").

Suppl. Br. Order at 1-3 (fn omitted).

In his response, Bayer correctly points out that "no court in this district has required plaintiffs pursuing a 503(b) interference-with-exercise-claims to prove a 'causal link' between their protected activity and a defendant's challenged actions." P. Resp. at 4, Dkt. No. 77 (citing *Dep't of Fair Empl. & Housing v. LSAC, Inc.*, 896 F. Supp. 2d 849 (N.D. Cal. 2012); *Breimhorst v. ETS*, 2000 WL 34510621 (N.D. Cal. Mar. 27, 2000)). But the cases Plaintiff cites plainly involved such a causal link, as the contested conduct (flagging the tests of students who used accommodations during the test) was directly connected to the protected conduct (using accommodations). *See* Suppl. Br. Order at 5-6 ("Neither order expressly announced a causality requirement between the protected act and the interference, but that connection is at the core of both decisions: the educational services flagged the test scores of certain students because they engaged in protected conduct by taking tests with accommodations.").

Bayer also correctly points out that none of the cases the Court cited in its Supplemental Briefing Order are binding (P. Resp. at 7), but given the Ninth Circuit's failure to address the central legal issue presented here, these cases provide a persuasive and useful analytical framework when attempting to understand the meaning of Section 503(b), which the Ninth Circuit has described as "not a model of draftsmanship." *Brown*, 336 F.3d at 1192.

Bayer invites the Court to adopt the "tends to chill" standard courts have applied in the context of NLRA interference claims. PMSJ at 14-15. In his Supplemental Brief, Bayer also invites the Court to follow the plain language of the statute, which does not limit interference claims to conduct taken "on account of" an individual having exercised or enjoyed his or her rights under the ADA. *See* P. Suppl. Br. at 2-4. But the Ninth Circuit declined to adopt the "tends to chill" standard or apply the plain, dictionary meaning of the language of Section 503(b), finding the FHA interference framework "more persuasive". *See Brown*, 336 F.3d at 1190. And courts that have interpreted the FHA interference statute, whose wording Congress adopted verbatim when drafting Section 503(b), have imposed some kind of causation or nexus requirement. For example, in describing the contours of Section 503(b), the Ninth Circuit cited with approval

12

*Michigan Protection and Advocacy Services, Inc. v. Babin*, 18 F.3d 337 (6th Cir. 1994). *Brown*, 336 F.3d at 1192-93. The Sixth Circuit in *Babin* grappled with the same difficulty the Ninth Circuit faced in *Brown*: how to balance the broad, remedial purpose of the FHA with the impact of too broad a reading of the FHA's interference provision:

> As the plaintiffs point out, the language "interfere with" has been broadly applied "to reach all practices which have the effect of interfering with the exercise of rights" under the federal fair housing laws. We agree with the plaintiffs that Congress intended the FHAA to be read with its remedial purpose in mind. Still, a court "cannot discover how far a statute goes by observing the direction in which it points."
>
> The plaintiffs would have us hold that any action whatsoever that in any way hinders a member of a protected class under the fair housing law in obtaining housing is a per se violation of § 3617, so long as there is some evidence of discriminatory effect or intent on the actor's part. On the other hand, the district court found that, in order to state a claim under § 3617, an allegation that a defendant "interfered with" a plaintiff's rights must include an allegation that the action had "some component of potent force or duress."
>
> We believe, however, that the scope of § 3617 should at least be analogous to the scope of § 3604(f). Section 3617 is not limited to those who used some sort of "potent force or duress," but extends to other actors who are in a position directly to disrupt the exercise or enjoyment of a protected right and exercise their powers with a discriminatory animus.

*Babin*, 18 F.3d at 347 (internal citations omitted). The Sixth Circuit subsequently clarified that a violation of the FHA could be shown either by proof of discriminatory animus or by proof of disparate impact or effect. *See Linkletter v. W. & S. Fin. Grp., Inc.*, 851 F.3d 632, 639-40 (6th Cir. 2017) (where defendant's actions only affected one class of people, women, plaintiff could state an FHA interference claim by alleging conduct "had a clear discriminatory effect"). The Court finds *Linkletter*'s analysis persuasive, and equally applicable to ADA Section 503(b).

Based on *Brown*, *Babin*, *Linkletter*, and the other authorities discussed above, the Court finds that to state a claim for interference with his rights under the ADA, Bayer must show some nexus between NMG's conduct surrounding the arbitration agreement, and his assertion or enjoyment of his rights under the ADA. Bayer can do so either by proof of discriminatory animus or by proof of discriminatory effect.

2. <u>Application of Law to Facts</u>

a. *Arbitration Agreement*

NMG's papers focus on the lack of substantive unconscionability inherent in the Arbitration Agreement, and argue that nothing in the Arbitration Agreement interfered with Bayer's rights under the ADA. *See* DMSJ at 11-23; Def.'s Opp'n at 18-23, Dkt. No. 35. But this approach elides the crucial fact that Bayer never agreed to be bound by the terms of the Arbitration Agreement; on the contrary, he repeatedly refused to be so bound in writing. This fact was recognized first by this Court, and affirmed by the Ninth Circuit in Lawsuit #2. The issue currently before this Court in Lawsuit #3 therefore is not whether the Arbitration Agreement is enforceable; indeed, the enforceability of the Arbitration Agreement generally is not relevant under these circumstances. Nor is the issue before this Court necessarily whether the Arbitration Agreement deprives Bayer of a substantive right under the ADA. What is relevant is whether NMG's conduct surrounding the Arbitration Agreement "interfered" with Bayer's rights under Section 503(b) – a broader inquiry than the one NMG would have this Court focus on.[4]

b. *Protected Conduct*

It is undisputed that Bayer engaged in protected conduct by requesting a reasonable accommodation on June 8, 2007; filing EEOC discrimination charges on June 20, 2007, July 9,

---

[4] NMG submitted two statements of recent decision in support of its Motion. *See* Dkt. No. 75 (submitting *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251 (9th Cir. 2017)); Dkt. No. 79 (submitting *Epic Sys. Corp. v. Lewis*, __ S. Ct. __, 2018 WL 2292444 (2018)). These cases are distinguishable from Bayer's because they concern employees who actually accepted arbitration agreements, and neither case pertains to the arbitration of claims that arose and were filed with the EEOC before the effective date of an arbitration agreement. The employee in *Poublon* signed the arbitration agreement after discussing it with her supervisor; she filed suit after her employment ended months later, and there is no suggestion in the opinion that her lawsuit arose from claims she had submitted to a government agency. 846 F.3d at 1259. The Ninth Circuit examined whether the arbitration agreement was binding, or whether the agreement was unenforceable as a result of procedural and/or substantive unconscionability. The Supreme Court's decision in *Epic* is similarly limited to employees who have agreed that any dispute between them and their employer will be resolved through one-on-one arbitration. *Epic*, 2018 U.S. LEXIS 3086, at *7; *cf. id.* at *50 n.2 (J. Ginsburg, dissenting, explaining the employers in *Epic* had emailed their employees arbitration agreements requiring resolution of wage and hour claims by individual arbitration, and the agreements provided that if the employees continued to work, they would be deemed to have accepted the agreement; questioning whether agreements were genuinely bilateral given the circumstances).

14

2007, and in January 2009; filing an NLRB charge against NMG on July 19, 2007; and filing these lawsuits. *See* JSUF ¶¶ 10, 13, 26, 30, 33.[5]

        c.     *Interference*

It is undisputed that NMG deployed its arbitration program after Bayer requested reasonable accommodations and filed discrimination charges with the EEOC. It is also undisputed that NMG attempted to have its employees, including Bayer, acknowledge the Arbitration Agreement, and also took the position that the only way in which employees could opt out of arbitration was by resigning from their employment. In addition, there are triable issues of fact that NMG (through Tang Lamb and Clay) threatened Bayer that he could or would be terminated if he did not sign the Acknowledgment Form. This evidence is disputed: Tang Lamb and Clay deny they threatened Bayer. NMG denies it would have encouraged any of its employees to pressure others to sign the Acknowledgment Form and points out this would not be logical given its position that employees were deemed to have accepted arbitration if they did not resign. Finally, it also is undisputed (based on the November 2017 letter) that NMG continued to send Bayer documents relating to the Arbitration Agreement for months after he refused to sign the Acknowledgment Form.

This evidence would allow a reasonable fact finder to conclude that NMG interfered with his ADA rights by forcing him to choose between his job or abandoning the litigation of his EEOC discrimination charge in the manner and forum of his choosing.

        d.     *Nexus*

Based on its analysis above (*see* Section B.1), the Court finds limited triable issues of fact exist as to whether NMG's conduct towards Bayer was causally connected to his engaging in

---

[5] In its Opposition to Bayer's Motion, NMG argues Bayer failed to establish he is disabled. *See* Def.'s Opp'n at 10-11. Section 503(b) is not limited to disabled individuals; it makes it unlawful to coerce, intimidate, threaten or interfere with any individual in the exercise or enjoyment of his rights granted or protected by the ADA. Indeed, courts have found that Section 503(a) claims, based on similar language, may be brought by individuals who are not themselves disabled. *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 502 (3d Cir. 1997); *Heisler v. Met. Council*, 339 F.3d 622, 630 n.5 (8th Cir. 2003) (employer has no obligation to accommodate employee who is not disabled, but ADA nonetheless prohibits employer from retaliating against employee who sought accommodation in good faith, even if employee is subsequently found not to be disabled).

15

protected conduct.

First, there is no evidence in the record creating a triable issue that NMG adopted the Arbitration Agreement or any portion of its ADR program in response to or in connection with Bayer requesting an accommodation, filing charges with the EEOC and NLRB, or filing any of his lawsuits. Holding NMG liable under Section 503(b) for deploying a mandatory ADR program to essentially all of its employees, absent any evidence this was done in connection with Bayer's protected conduct, would be extending "interference" in the manner counseled against by *Brown*.

Second, there also is no evidence that NMG's initial follow ups with employees who did not sign and return the forms, including Bayer, had any connection with Bayer's protected conduct. In fact, both Clay and Tang Lamb declare they did not know Bayer had made a request for accommodation or filed an EEOC charge. Clay Decl. ¶ 11; Tang Lamb Decl. ¶ 11; *see also* Tang Lamb Dep. at 35:14-22 & 37:18-22, Dkt. No. 34-6 (Tang Lamb did not know Bayer had filed an EEOC charge for failure to accommodate). Bayer offers no evidence to the contrary.

There is, however, evidence that NMG pressured Bayer to sign the Acknowledgement Form after he informed HR in writing on July 10, 2007 that he would not do so, in part because he was concerned that it would prevent him from asserting claims based on his pending EEOC charges. *See* Bayer Decl. ¶¶ 10, 12, 14-15; *see also supra*. In light of the (disputed) evidence before the Court, *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261 (11th Cir. 2008), supports Plaintiff's position that repeatedly requiring an employee to sign an arbitration agreement when the employee has already filed EEOC discrimination charges and already refused to sign the arbitration agreement constitutes interference under Section 503(b). PMSJ at 19. After Goldsmith filed an EEOC discrimination charge, Bagby Elevator asked him to sign and return a copy of an arbitration agreement that required him to arbitrate all past, present, and future claims against Bagby; Bagby asked all other employees to do the same. Goldsmith refused, as did a white employee, Isbell. Bagby told Goldsmith and Isbell they would be fired if they refused to sign the agreement. Goldsmith and Isbell packed their bags and went to leave. A Bagby employee stopped Isbell, told him he should not resign, and urged him to speak to someone about the agreement; Isbell signed the document after speaking to his union representative, and was not fired

16

when he returned the next day. *Id.* No one asked Goldsmith, who was African American, to reconsider. *Id.* Goldsmith subsequently asked Bagby to amend the agreement to remove references to past and present claims and explained he did not want the agreement to apply to his pending EEOC charge. Bagby rejected the proposition. When Goldsmith continued to refuse to sign the agreement and refused to resign from his employment, Bagby fired him. Based on this evidence, the Eleventh Circuit affirmed the district court's denial of Bagby's motion for judgment as a matter of law regarding Bagby's retaliation claims under Title VII and 42 U.S.C. § 1981. *Id.* at 1277-79. The Eleventh Circuit agreed with Goldsmith "that his immediate termination for his refusal to sign the agreement established a causal relation between his protected activity—the filing of his charge of discrimination—and his termination. . . . Goldsmith was terminated immediately after and because he refused to sign an agreement that would have applied to his pending charge. . . . Bagby Elevator does not dispute that Steber was aware of Goldsmith's EEOC charge when Steber terminated Goldsmith and that Goldsmith was the only employee who had a charge of discrimination pending when Bagby Elevator required all of its employees to sign the agreement." *Id.* at 1278. "Bagby Elevator stated that its reason for Goldsmith's discharge was his refusal to sign the agreement, but that reason is retaliatory. The agreement would have affected Goldsmith's continued pursuit of his pending charge of discrimination" by denying him a right to jury trial. *Id.* at 1279.[6]

NMG argues the factual and legal circumstances surrounding the Arbitration Agreement are different than the circumstances in *Bagby*: (1) Bayer was not required to sign the Arbitration Agreement and was not terminated when he refused to do so; and (2) NMG never moved to compel arbitration of the lawsuit that arose from the sole pending EEOC charge. Def.'s Opp'n at 17. The Court agrees *Bagby* presents a very different factual scenario than exists here. But as described above, Bayer has created a triable issue of fact that NMG did threaten to terminate Bayer if he did not sign the Agreement even after Bayer explained he did not want to do so

---

[6] In response to the Order for Supplemental Briefing, Plaintiff correctly points out that the Eleventh Circuit did not rely upon the evidence of race-based discrimination and focused instead on the employer's insistence that the plaintiff give up the right to pursue his pending EEOC charges in court. P. Suppl. Br. at 10 n.6.

17

because he did not want to be forced to arbitrate the claim raised in his pending EEOC charge. In addition, Bayer offers evidence that NMG made plain to him its position that the only way he could exclude himself from the Arbitration Agreement was by resigning, something Bayer could not afford to do given his need for medical insurance. And while NMG may never have moved to compel arbitration on that EEOC charge, there is no evidence that NMG assured Bayer at any point that the charges he had already filed would not be subject to the Arbitration Agreement.

A triable issue of fact thus exists as to whether NMG's employees engaged in conduct that a jury could reasonably interpret as pressuring Bayer to choose between his continued employment (and the health insurance that accompanied his employment) and his ability to eventually litigate the claims at issue in his pending EEOC charges in a court of law, even after Bayer explicitly informed NMG that he refused to accept the Arbitration Agreement. A reasonable jury could find this Hobson's choice would have a disparate impact on persons, such as Bayer, who had already filed discrimination charges with the EEOC and were awaiting their right to sue letters. Alternatively, a reasonable jury could find that NMG's conduct after July 10, 2007 was motivated by a desire to pressure Bayer to abandon his pending EEOC charges.

With respect to NMG's conduct after July 10, 2007, the Court therefore finds Bayer has created a triable issue of fact that NMG's conduct constituted interference under Section 503(b). Whether these facts, if established, are sufficient to constitute interference under Section 503(b) is a question for a jury.

## CONCLUSION

Based on the analysis above, the Court hereby **DENIES** Defendant's Motion for Summary Judgment and **DENIES** Plaintiff's Motion for Summary Judgment. The parties shall appear for a status conference on June 14, 2018 at 10:00 a.m.

**IT IS SO ORDERED.**

Dated: May 30, 2018

MARIA-ELENA JAMES
United States Magistrate Judge

18