UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAYLER BAYER,<br><br>        Plaintiff,<br><br>v.<br><br>NEIMAN MARCUS GROUP, INC.,<br><br>        Defendant. | Case No. 13-cv-04487-TSH<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Following a bench trial in this matter, the Court enters the following findings of fact and conclusions of law. To the extent any portion of a finding of fact contains a conclusion of law, the Court intends for that portion to be considered a conclusion of law, and the reverse is true to the extent any portion of a conclusion of law contains a finding of fact.

## I.    FINDINGS OF FACT

**A.    Plaintiff Bayer's Employment and Medical Condition**

    1.     Headquartered in Texas, Neiman Marcus operates a chain of retail department stores, including a store in downtown San Francisco. Stip. Facts ¶¶ 1-3.[1]

    2.     In March 2006, Plaintiff Tayler Bayer began working at that store as a sales associate in the cosmetics department. Stip. Facts ¶¶ 1, 3.

    3.     During the first year of his employment, Bayer worked a regular schedule of five days per week, six hours per day. Stip. Facts ¶ 5. He was therefore eligible for, and received, "full time" benefits including medical insurance, which Neiman Marcus provided to all employees

---

[1] The parties stipulated to 60 undisputed facts in an Agreed Statement filed as part of their February 21, 2019 Joint Pretrial Conference Statement, ECF No. 105 at 7-14. Those stipulated facts are cited as "Stip. Facts."

who worked 30 hours or more per week.  Stip. Facts ¶¶ 4-5.

4. In March 2007, Bayer was placed on medical leave due to respiratory problems that were later diagnosed as emphysema. He had to start walking with a cane and lost a significant amount of weight.  Trial Tr. 33:11-34:1; Trial Ex. 8.[2]

5. In late May 2007, Bayer's physician authorized his return to work, but limited him to a four-day work week, while permitting him to work a full eight-hour shift on each of those days.  Stip. Facts ¶¶ 7-10; Trial Exs. 9-10.

6. Bayer returned to work in early June 2007 and provided Neiman Marcus with notes from his doctor explaining his work restrictions.  Stip. Facts ¶¶ 8-9; Trial Exs. 8-10.

7. On or about June 8, 2007, Bayer asked Neiman Marcus to accommodate his medical condition by modifying his full-time work schedule from five six-hour shifts per week (30 hours) to four seven-and-a-half hour shifts per week (also 30 hours), so he could comply with his doctor's restrictions while maintaining the minimum 30-hour per week schedule required to maintain medical benefits.  Stip. Facts ¶ 13; Trial Tr. 35:10-36:6.

8. Neiman Marcus rejected Bayer's request for accommodation, instead eliminating one of five work days from Bayer's weekly schedule so he would work only four six-hour shifts per week—meaning his salary would be reduced by 20% and his medical benefits would be eliminated.  Stip. Facts ¶¶ 11, 14-15.

9. Bayer responded by going to the EEOC, without the assistance of counsel, and filing an administrative charge on June 20, 2007, alleging that Neiman Marcus had violated the Americans with Disabilities Act ("ADA") by failing to accommodate his disability condition ("EEOC Charge #1").  Stip. Facts ¶ 19; Trial Tr. 36:9-18; Trial Ex. 11.

**B.      Neiman Marcus's Mandatory Arbitration Agreement**

10. On June 11, 2007, Neiman Marcus mailed to all of its at-will employees, including Bayer, documents concerning its new dispute resolution program, called "NMG Resolutions." NMG Resolutions established a four-step dispute resolution process that included, as a last step,

---

[2] Cites to "Trial Tr." are to the transcript of the April 29, 2019 trial.  Cites to "Trial Ex." are to the exhibits that were admitted during the trial.

2

1  mandatory arbitration. Stip. Facts ¶ 16. These dispute resolution materials, including the
2  Arbitration Agreement, were drafted well before Bayer's June 8 request for an accommodation
3  and were not a response to it. Trial Tr. 71:13-72:3.

4      11.    Sometime before June 20, 2007, Bayer received a memorandum that generally
5  summarized the NMG Resolutions program. Stip. Facts ¶ 17; Trial Tr. 54:9-12; Trial Ex. 1.

6      12.    On June 20, 2007, Bayer received in the mail the packet of documents from
7  Neiman Marcus that described and set forth its new mandatory arbitration program. Those
8  documents included: (1) the Neiman Marcus Group, Inc. Mandatory Arbitration Agreement, Trial
9  Ex. 2; (2) the Arbitration Agreement Acknowledgment Form, Trial Ex. 3; (3) a document entitled
10 NMG Resolutions: A 4-Step Process, Trial Ex. 4; and (4) a set of Frequently Asked Questions
11 relating to the Arbitration Agreement, Trial Ex. 5. Stip. Facts ¶ 18; Trial Tr. 37:24-38:4. Because
12 Bayer received these documents in the mail on June 20 – the same day he submitted his first
13 EEOC charge – Neiman Marcus must have mailed them before the charge was filed. Trial Tr.
14 53:22-24.

15     13.    The documents that Neiman Marcus provided to Bayer on June 20, 2007 stated that
16 Neiman Marcus's new workplace policies were not optional and would apply to all Neiman
17 Marcus employees who continued to work for the company on or after July 15, 2007. The
18 language in the Arbitration Agreement and in the accompanying documents made it clear that
19 Neiman Marcus was telling employees, including Bayer, that they had to choose between ending
20 their employment by July 14, 2007, or being bound by all of the terms of Neiman Marcus's new
21 policy. Stip. Facts ¶¶ 20-24; Trial Exs. 2-5.

22     a.    The inside front cover of the Arbitration Agreement stated in italics and all capital
23 letters: "*THIS AGREEMENT FOR MANDATORY ARBITRATION IS NOT*
24 *OPTIONAL. IT IS MANDATORY AND A CONDITION AND TERM OF YOUR*
25 *EMPLOYMENT. IF YOU ARE AN EMPLOYEE ON OR AFTER JULY 15, 2007,*
26 *WHICH IS THE EFFECTIVE DATE OF THIS AGREEMENT (THE 'EFFECTIVE*
27 *DATE'), YOU ARE DEEMED TO HAVE ACCEPTED AND AGREED TO THE*
28 *MANDATORY ARBITRATION AGREEMENT BY COMING TO WORK AFTER*

3

*THAT DATE.*" Trial Ex. 2.

    b. The Agreement went on to state, in bold and italics: "***Each Covered Employee's employment or continued employment with the Company after the Effective Date constitutes assent, acceptance, consent, and consideration for this Agreement to arbitrate, both during the time of employment and after termination of employment.***" *Id.* at 1.

    c. The Agreement later reiterated: "All employees of the Company who are employed by the Company on or after the Effective Date … are covered by this Agreement …." *Id.* at ¶ 2.

    d. The FAQs accompanying the Agreement made clear that employees, including Bayer, had no option to continue working after July 15, 2007 without becoming bound to all terms of the Arbitration Agreement: "***Can I refuse the Arbitration Agreement and continue working for the Company?*** No." Trial Ex. 5 at 4.

    e. The Acknowledgment Form reiterated that employees, including Bayer, had no options other than quitting their job before July 15, 2007 or becoming bound by the Agreement: "[T]he Arbitration Agreement is **not optional**. Rather, it is **mandatory** and a condition and term of my employment if I am employed or continue employment on or after July 15, 2007." Trial Ex. 3.

    f. The NMG 4-Step document similarly stated: "The Arbitration Agreement is not optional, and your employment or continued employment with the Company on or after July 15, 2007 will be deemed your acceptance of the Arbitration Agreement." Trial Ex. 4 at 2. It went on to reiterate: "Please understand that the Arbitration Agreement is mandatory …." *Id.* at 4.

    g. The June 11, 2007 memorandum likewise stated: "*NMG RESOLUTIONS:* … **is mandatory** – if you continue your employment with The Neiman Marcus Group … on or after July 15, 2007, then *NMG RESOLUTIONS* and the Arbitration Agreement will apply to you." Trial Ex. 1 at 2-3.

14. Neiman Marcus's witnesses confirmed that the message the company intended to

4

convey through these documents was that its employees, including Bayer, had to choose between giving up their jobs before July 15, 2007, or becoming bound by all the terms of the company's new Arbitration Agreement. Neiman Marcus's Vice President of Associate Relations testified that if an employee like Bayer did not want to be bound by the Arbitration Agreement, his only option was to quit. Trial Tr. 84:17-18 ("I think it was very clear that anyone who came to work after July 15th would be bound by the agreement."), 88:2-15; Trial Ex. 23 (Kern Depo.) 17:4-18:4.

15. When asked at trial, "If [Bayer] didn't want to be bound by [the arbitration agreement,] he had to not show up to work on the 15th, correct?," Kelly Hale, the manager of human resources at Neiman Marcus's San Francisco store at the time, testified: "If he wanted to remain employed, he would be bound by the arbitration agreement. So, yes, if he continued his employment, he would be bound or he could choose to resign." Trial Tr. 105:7-14.

16. Hale also confirmed that the consequence of Bayer refusing to be bound by the agreement would be the loss of his health insurance benefits and salary. Trial Tr. 105:20-106:2.

17. Neiman Marcus's mandatory Arbitration Agreement included the following provisions, among others:

    a. The Agreement required Neiman Marcus's covered employees to arbitrate every claim they might have against Neiman Marcus, including claims that had already been the subject of an administrative charge but had not yet been filed as a state or federal court lawsuit at the time the agreement took effect—which included Bayer's EEOC Charge #1 (filed June 20, 2007) and his soon-to-be-filed EEOC Charge #2 (filed July 9, 2007), discussed below. Arb. Agreement ¶¶ 1a, 3.

    b. The Agreement required Neiman Marcus's covered employees to file a charge with the EEOC and exhaust all administrative remedies before filing a claim for arbitration, and it required that any claim for arbitration be brought within one year of the employee's last day of employment with the company. Arb. Agreement ¶¶ 14, 21.

    c. The Agreement required Neiman Marcus's covered employees to waive their right to a jury trial, Arb. Agreement ¶ 1.d; required that all arbitrators reside and be

5

licensed to practice in Texas, *id.* ¶ 9.c; required that arbitrators apply the law of Texas and the 5th Circuit, *id.* ¶16, 17; and allowed the "respondent," which would typically be Neiman Marcus, to appoint two additional arbitrators at any time before the formal commencement of the arbitration hearing, *id.* ¶9.a.

d. The Agreement placed limits on the scope of discovery, including that each side may take no more than three depositions, and that depositions of corporate representatives are limited to no more than three designated topics. Arb. Agreement ¶12.

e. The Agreement gave Neiman Marcus the power to amend, modify or revoke any term of the Agreement at any time, but only upon 30 days' advance notice to the covered employee. Any such change to the agreement had no effect on any claim that had already been filed for arbitration. Arb. Agreement ¶ 21.

f. The Agreement prohibited employees from bringing class actions or otherwise joining their claims with those of co-workers. Arb. Agreement ¶ 15.

g. The Agreement gave the Arbitrator authority to award costs and fees to either party "to the extent such an award is permitted by applicable law" and provided that the Arbitrator has the "power to award sanctions for failure by either a party or their counsel to comply with this Agreement," which "may include, but are not limited to, assessment of costs, including attorney's fees." Arb. Agreement ¶¶ 11, 18.

18. When Bayer received and read the Arbitration Agreement and accompanying documents in June 20, 2007, he understood that Neiman Marcus was requiring him to choose by July 15, 2007 to either give up his job or agree to the agreement. Bayer testified that when he first read the documents, he "felt sick." "The word mandatory just kept jumping up because it is repeated so many multiple times." Bayer's first response was, "I'm not signing away my rights," but the documents said "mandatory, mandatory, mandatory; and it is saying it is a condition of your continued employment." Bayer also testified that had the mandatory arbitration agreement been in place before he was offered his job, he "would have never taken the position." Trial Tr. 38:7-18, 39:7-8.

**C.	Bayer Rejected the Agreement and Filed a Second EEOC Charge**

19.	Bayer repeatedly informed Neiman Marcus that he did not, and would not, agree to be bound by the new arbitration agreement. Stip. Facts ¶¶ 27, 35-36; Trial Tr. 40:16-41:11; Trial Ex. 7. However, in June 2007, he did not tell anyone in HR or management that he had filed his first EEOC charge. Trial. Tr. 54:18-21.

20.	Neiman Marcus adhered to its position that if Bayer came to work on or after July 15, 2007, he would be deemed to have consented to the Arbitration Agreement. Stip. Facts ¶ 28.

21.	Cosmetics department assistant manager Elizabeth Clay and coordinator Lily Tang Lamb were responsible for following up with employees in the cosmetics department, including Bayer, to ensure that those employees had received the mandatory Arbitration Agreement and accompanying documents in the mail. Clay and Lamb were also responsible for collecting signed Acknowledgment Forms from each employee. Stip. Facts ¶¶ 25-26; Trial Tr. 40:3-15. Bayer did not tell them about his first EEOC charge. They did not know about it or about his previous request for an accommodation. Trial Tr. 54:22-55:2, 109:22-110:5, 122:4-14.

22.	Clay and Lamb spoke to Bayer about the Arbitration Agreement. They are the only employees who followed up with him about the Arbitration Agreement and the Acknowledgment Form. Bayer informed them both that he was refusing to sign the Acknowledgment Form or to be bound by the Arbitration Agreement. Stip. Facts ¶¶ 25-27; Trial Tr. 40:16-41:11, 55:3-6.

23.	Clay and Lamb had initial conversations with Bayer on or around June 26 and further conversations with him on or around June 29 or 30. Trial Tr. 55:13-56:8. Clay and Lamb did not threaten that Bayer would be fired if he refused to sign the Acknowledgment Form. Trial Tr. 109:13-21, 114:9-23, 121:10-19.

24.	Clay and Lamb did not tell Bayer that his last day of employment with Neiman Marcus would be July 14, 2007 if he refused to sign the Acknowledgment Form. Trial Tr. 109:13-21, 114:9-23, 121:10-19.

25.	After informing Clay and Lamb that he refused to sign the Acknowledgment Form and refused to be bound by the Arbitration Agreement, Bayer sent an email to Greg Carlson in human resources on July 1, 2007, requesting a meeting to discuss his concerns. Stip. Facts ¶ 30;

Trial Ex. 6. Bayer testified that he sent the email because he "wanted information" and "didn't want to fight." Bayer wanted to keep his job, but he was not willing to "sign away" his rights to do so. Trial Tr. 41:22-24.

26. Bayer testified at trial that Clay and Lamb said in their June 29 or 30 conversations with him that if he didn't sign the Acknowledgment Form, July 14 would be his last day of work. The Court does not find that testimony credible. Clay and Lamb both denied this happened. Bayer's July 1 email to assistant HR director Carlson was just a day or two after that alleged threat was made. The subject matter of the email was the Arbitration Agreement and Bayer's concerns about it. His email specifically mentioned his conversation with Clay. Yet it did not mention her or Lamb's alleged threat to his employment. Trail Ex. 6; Trial Tr. 41:4-11, 16-19; 56:5-17, 109:13-21, 114:9-23, 121:10-19.

27. Neiman Marcus's policy was that if an employee did not sign the Acknowledgment Form, the employee would have a meeting with a human resources representative who would read to the employee language from Neiman Marcus's "Refusal to Sign" form that stated in part: "*THE MANDATORY ARBITRATION AGREEMENT REQUIRES YOU TO SUBMIT ALL CLAIMS YOU HAVE AGAINST THE COMPANY AND THE COMPANY TO SUBMIT ALL CLAIMS IT HAS AGAINST YOU TO BINDING ARBITRATION. THE ARBITRATION AGREEMENT COVERS ALL CLAIMS, WHETHER THEY BE COMMON LAW, STATUTORY (SUCH AS STATE AND FEDERAL DISCRIMINATION CLAIMS) OR OTHERWISE – IN SHORT ANY CLAIM. [¶¶]... THIS PROGRAM FOR BINDING ARBITRATION IS NOT OPTIONAL. IT IS MANDATORY AND A CONDITION AND TERM OF YOUR EMPLOYMENT.*" Trial Tr. 74:16-25; Trial Ex. A.

28. Carlson did not respond to Bayer's email and no meeting took place. Stip. Facts ¶ 31. Even though Carlson acknowledged receiving Bayer's email and told Bayer that he would follow up, no such follow up occurred. Trial Tr. 42:15-22.

29. On July 9, 2007, Bayer filed a second charge with the EEOC ("EEOC Charge #2")—the charge that gave rise to this lawsuit—which alleged that Neiman Marcus interfered with his rights in violation of section 503(b) of the ADA by pressuring him to choose between his job and his ADA rights. Stip. Facts ¶ 33; Trial Ex. 12. Bayer thus had two separate EEOC charges

8

pending against Neiman Marcus at the time the Arbitration Agreement was scheduled to take effect, both of which would be covered by that Agreement if it were enforceable against Bayer. Trial Tr. 89:8-13; Trial Ex. 23 (Kern Depo.) 34:13-37:4.

30. On July 10, 2007, Bayer sent a letter to Neiman Marcus stating that he refused to agree to the company's new mandatory Arbitration Agreement, explaining many of the reasons why he believed the Agreement unlawfully deprived him of substantive rights under the ADA, and informing Neiman Marcus that he now had two separate EEOC Charges pending against it. Stip. Facts ¶ 35; Trial Ex. 7. This July 10 letter was the first time Bayer told Neiman Marcus that he had filed an EEOC claim. Trial Tr. 55:7-12. This letter, like Bayer's July 1 email, did not mention any alleged threat to his employment by Clay or Lamb. In fact, the letter ends with the statement: "I intend to continue to do my job to the best of my ability and I expect the company will follow Federal and State law and not retaliate against me for my opposition and refusal to be bound by this unlawful agreement." Trial Ex. 7. If Clay or Lamb had threatened his employment, it is very strange there was no mention of that in this letter.

31. Neiman Marcus did not respond to Bayer's July 10, 2007 letter or otherwise tell him that his understanding of the choice that the company was imposing on him—give up his job or give up his statutorily-protected rights—was anything but accurate. Trial Tr. 44:9-10, 21-23. To the contrary, Neiman Marcus's Vice President of Associate Relations, Nina Kern, testified that there was no need for management to follow up with Bayer after receiving this letter because "he had already sent a letter to us indicating his knowledge of the mandatory arbitration agreement and his understanding of the terms." Trial Tr. 75:3-10; *see also* Trial Tr. 75:16-18.

32. After Bayer sent his July 10 letter, Neiman Marcus dropped all communications with him about the Arbitration Agreement and Acknowledgment Form. Trial Tr. 59:2-9.

33. Bayer felt intense pressure and coercion during the more than three weeks between June 20 and July 15, 2007 and beyond. Trial Tr. 52:1-4. He testified that being caught in the position that Neiman Marcus forced upon him was "devastating." The "stress was just insane." He needed to get a prescription for an antidepressant and sleep aid to help him cope with that stress. Trial Tr. 45:10-23. Bayer fully expected to be fired when he came to work on July 15,

2007 because he had made clear to Neiman Marcus that he did not agree to be bound by its new workplace policies. Trial Tr. 45:24-46:4. Bayer testified that "this was one of the most stressful times I have ever been through in my life." Trial Tr. 52:24-25.

## D. Neiman Marcus Insisted That Bayer Was Bound by Its Arbitration Agreement, But the Company Was Wrong

34. Bayer came to work on the morning of July 15, 2007, and continued to work at Neiman Marcus without being disciplined until January 2009. Stip. Facts ¶ 38.

35. On and after July 15, 2007, and continuing until July 3, 2014, Neiman Marcus continued to adhere to its position, including in a series of filings in federal court, that Bayer had consented to be bound by the Arbitration Agreement despite his repeated objections, because he had come to work on and after July 15, 2007. Stip. Facts ¶¶ 47, 49, 54.

36. On July 30, 2007, Bayer submitted a letter to the National Labor Relations Board concerning his two pending EEOC charges against Neiman Marcus. The concluding sentence of the letter stated that Bayer had retained counsel. This is the first written document stating that Clay told Bayer that if he did not sign the Acknowledgment Form, July 14 would be his last day of work. Trial Ex. C.

37. In October 2007, the EEOC issued a right-to-sue letter in response to Bayer's EEOC Charge #1 (the charge he had filed in June 2007, alleging unlawful refusal to accommodate). Stip. Facts ¶ 41; Trial Ex. 15. Bayer brought suit against Neiman Marcus on that charge three months later in January 2008 (*Tayler Bayer v. Neiman Marcus Holdings, Inc*., N.D. Cal. Case No. C-08-0480-PJH) ("Lawsuit #1"). Stip. Facts ¶ 42. The parties later resolved that case. Stip. Facts ¶ 43.

38. In the fall of 2007, Neiman Marcus distributed to its employees, including Bayer, a new Employee Handbook that referenced Neiman Marcus's mandatory arbitration agreement. Trial Tr. 46:24-47:9. Bayer refused to sign the Handbook acknowledgment and wrote a letter to human resources dated November 28, 2007, which attached a copy of his July 10, 2017 letter and explained that he was not signing because the Handbook referenced the mandatory arbitration agreement, and because he continued to refuse to agree to that agreement. Stip. Facts ¶ 39; Trial

Tr. 47:4-48:1; Trial Ex. 16.

39. The EEOC's investigation into Bayer's EEOC Charge #2 (the July 2007 "interference" charge that underlies this lawsuit) continued for several years. On June 30, 2009, almost two years after Bayer filed EEOC Charge #2, the EEOC issued a "Determination Letter" that found "cause" to believe that Neiman Marcus had violated Bayer's substantive rights under the ADA and other federal employment laws. Stip. Facts ¶ 34; Trial Ex. 13. The EEOC issued a right-to-sue letter on Bayer's EEOC Charge #2 in July 2013, six years after Bayer filed the charge. Stip. Facts ¶ 52; Trial Ex. 19. By then, Bayer was no longer working for Neiman Marcus, as he had been terminated in January 2009, for reasons he contended were retaliatory. Stip. Facts ¶ 44.

40. Bayer filed the present lawsuit in September 2013 (Lawsuit #2), two months after receiving his EEOC right-to-sue letter. Bayer alleged in this lawsuit that Neiman Marcus's insistence (beginning in June and July 2007) that he choose between quitting his job and being bound by the Arbitration Agreement, and Neiman Marcus's continued insistence for years that he in fact was bound by that Agreement, violated section 503(b) of the ADA. Stip. Facts ¶ 53; Complaint (ECF No. 1).

41. Bayer filed a third EEOC charge in August 2009, alleging that his January 2009 termination was retaliatory and was designed to punish him for having filed and pursued his previous EEOC claims and federal court lawsuit. Stip. Facts ¶ 44; Trial Ex. 17. The EEOC issued a right-to-sue letter with respect to EEOC Charge #3 in April 2011. Stip. Facts ¶ 45; Trial Ex. 18.

42. Bayer filed his third federal court lawsuit, with respect to EEOC Charge #3, in July 2011, alleging that Neiman Marcus had wrongfully terminated him in violation of the ADA's anti-retaliation provisions. *Tayler Bayer v. Neiman Marcus Group, Inc.*, Case No. CV-11-3705-MEJ ("Lawsuit #3"); Stip. Facts ¶ 46.

43. In response to Bayer's Lawsuit #3, Neiman Marcus filed a Motion to Compel Arbitration, contending that Bayer was bound by the June 2007 Arbitration Agreement because he had shown up for work on and after July 15, 2007. Stip. Facts ¶ 47; Trial Tr. 50:7-10. In November 2011, Magistrate Judge Maria-Elena James of this Court denied Neiman Marcus's motion to compel arbitration on the ground that Bayer had never consented to be bound. Stip.

Facts ¶ 48.

44. Neiman Marcus appealed Judge James's order refusing to compel arbitration of Lawsuit #3. Stip. Facts ¶ 49. On July 3, 2014, the Ninth Circuit affirmed Judge James's order, holding that Bayer had never consented to be bound by Neiman Marcus's Arbitration Agreement and therefore was not required to arbitrate his claims of unlawful retaliation. *Tayler Bayer v. Neiman Marcus Group, Inc.*, No. 11-17920, 582 Fed. Appx. 711 (9th Cir. July 3, 2014); Stip Facts. ¶ 50. Lawsuit #3 has since been resolved by the parties. Stip. Fact ¶ 51.

## II. PROCEDURAL BACKGROUND

On January 22, 2015, Judge James granted Neiman Marcus's initial motion for summary judgment in this action on grounds of mootness, finding that no relief was available to Bayer. The essence of her ruling was that the Ninth Circuit had resolved in Bayer's favor the question of whether the Arbitration Agreement applied to him, and there was nothing further the Court could award him in this action because only equitable remedies are available to a plaintiff suing under section 503(b). ECF No. 45. Bayer could not recover compensatory damages because they are not an equitable remedy. Bayer no longer sought injunctive relief as he was no longer employed by Neiman Marcus. She concluded that nominal damages were not an equitable remedy. Judge James acknowledged that restitution can sometimes be a form of equitable relief, but concluded there was no evidence that the type of restitution Bayer sought here was equitable in nature. Finally, she held that declaratory relief was moot in light of the outcome of Lawsuit #3.

The Ninth Circuit upheld Judge James's decision in large part but reversed on the availability of nominal damages, holding that the ADA "authorizes courts to award nominal damages as equitable relief when complete justice requires." *Bayer v. Neiman Marcus Group, Inc.*, 861 F.3d 853, 874 (9th Cir. 2017). On remand, Judge James issued two orders that framed the issues for trial. First, on March 29, 2018, she issued an order for supplemental briefing on the summary judgment motions the parties had filed on remand. In this order Judge James surveyed the case law interpreting section 503(b). She observed that "[n]either the Supreme Court nor the Ninth Circuit has outlined a legal test for a Section 503(b) interference claim, but *Brown v. City of Tucson*, 336 F.3d 1181 (9th Cir. 2003), provides helpful guidance." ECF No. 76 at 1. She noted

12

that in *Brown*, the Ninth Circuit found that the anti-interference provisions of the ADA and the Fair Housing Act ("FHA") were identical and that this served as an indication that Congress intended the provisions to be interpreted the same way. *Id*. She explained that while *Brown* recited a causality requirement for a section 503(a) claim, it did not clarify whether a section 503(b) interference-only claim required a causal link between the employee's enjoyment of such a right and the employer's conduct. *Id*. at 2. Judge James noted that "[c]ourts in other circuits that have squarely addressed the causality requirement have imposed a causality and/or discriminatory intent element to Section 503(b) claims." *Id*. at 3. She then ordered the parties to file further briefing on whether Bayer must show that Neiman Marcus's efforts to have him sign the Arbitration Agreement have a causal link to his protected conduct, and if so, whether there is a triable issue of fact concerning that link.

Second, Judge James denied both sides' motions for summary judgment in an order dated May 30, 2018. ECF No. 80. After once again reviewing the case law, and now with the benefit of the parties' additional briefing, Judge James concluded that as a matter of statutory interpretation, "to state a claim for interference with his rights under the ADA, Bayer must show some nexus between NMG's conduct surrounding the arbitration agreement, and his assertion or enjoyment of his rights under the ADA. Bayer can do so either by proof of discriminatory animus or by proof of discriminatory effect." *Id*. at 13.

Applying the law to the facts, she concluded that whether the Arbitration Agreement was enforceable was not the issue before the Court. *Id*. at 14. Rather, "[w]hat is relevant is whether NMG's conduct surrounding the Arbitration Agreement 'interfered' with Bayer's rights under Section 503(b) – a broader inquiry than the one NMG would have this Court focus on." *Id*. She concluded that "there are triable issues of fact that NMG (through Tang Lamb and Clay) threatened Bayer that he could or would be terminated if he did not sign the Acknowledgment Form." *Id*. at 15. She also found "limited triable issues of fact exist as to whether NMG's conduct towards Bayer was causally connected to his engaging in protected conduct." *Id*. at 15-16. Specifically, [t]here is . . . evidence that NMG pressured Bayer to sign the Acknowledgement Form after he informed HR in writing on July 10, 2007 that he would not do so, in part because he

13

1 was concerned that it would prevent him from asserting claims based on his pending EEOC

2 charges." *Id*. at 16. "A triable issue of fact thus exists as to whether NMG's employees engaged

3 in conduct that a jury could reasonably interpret as pressuring Bayer to choose between his

4 continued employment (and the health insurance that accompanied his employment) and his

5 ability to eventually litigate the claims at issue in his pending EEOC charges in a court of law,

6 even after Bayer explicitly informed NMG that he refused to accept the Arbitration Agreement."

7 *Id*. at 18. Given those triable issues of fact, Judge James denied summary judgment for both sides.

8 *Id*.

9 On September 4, 2018, the case was reassigned to the undersigned following Judge

10 James's retirement. ECF No. 98. The Court held a bench trial on April 29, 2019, ECF No. 113.

### III. CONCLUSIONS OF LAW

12 With the change in judges, Bayer wants to wipe the slate clean. He urges the Court to

13 disregard Judge James's 2018 orders that interpreted section 503(b) and determined what triable

14 questions of fact remained to be decided. The Court rejects this invitation.

15 At trial Bayer failed to prove his case. There was no causal connection between Neiman

16 Marcus's roll-out of its Arbitration Agreement and Bayer's protected conduct. The company

17 rolled out the program for all of its at-will employees nationwide. It was not aimed at Bayer or

18 disabled employees generally. The company mailed Bayer and every other at-will employee

19 information about the new dispute resolution process before he even filed his first EEOC charge.

20 Neiman Marcus had begun drafting this nationwide program long before Bayer's initial request for

21 a reasonable accommodation. There is simply no causal link between Bayer's protected activity

22 and Neiman Marcus's general roll-out of its new Arbitration Agreement.

23 Further, the manner in which Neiman Marcus communicated specifically with Bayer about

24 the Arbitration Agreement and attempted to have him sign the Acknowledgment Form did not

25 single him out or pressure him and was not in any way based on his protected conduct. The only

26 Neiman Marcus employees who spoke with Bayer about the Arbitration Agreement were Clay and

27 Lamb. They did not say or imply he would be fired if he failed to sign the Acknowledgment

28 Form. They had only a couple of conversations with him – on or around June 26 and then again

on June 29 or 30. Their conduct was not retaliatory or in any sense driven or affected by the fact that Bayer had previously made a request for an accommodation and had filed an EEOC charge because they simply did not know about either of those things. There is also no evidence of any communications with Bayer – let alone any pressure on him – about the Arbitration Agreement after he told Clay and Lamb on June 29 or 30 that he would not sign the Acknowledgment Form and did not agree to the Arbitration Agreement.

The Court has no reason to doubt that Bayer found the whole experience stressful. His stress resulted from receiving the same documents the other at-will employees did, which clearly stated that his continued employment on or after July 15, 2007 would mean that he was bound by the Arbitration Agreement. In his case, that turned out not to be true, but Neiman Marcus was certainly communicating that as its position. But finding that a company's general roll-out of an arbitration agreement to all of its at-will employees could give rise to liability under section 503(b) just because one of the employees on the receiving end had recently requested an accommodation under the ADA or filed an EEOC charge would give breathless scope to the statute. As a reminder, section 503(b) states: "It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." 42 U.S.C. § 12203. Any large company is going to have at least some employees who have requested an accommodation under the ADA or who have filed an EEOC charge. And it is common in the employment context for arbitration agreements to cover all employment-related claims and to have provisions that provide more streamlined procedures than apply to litigation in court. Without expressing any view on the lawfulness of Neiman Marcus's Arbitration Agreement in particular, the Court finds that allowing section 503(b) liability to attach when the employer's conduct – meaning *both* Neiman Marcus's general roll-out of its new dispute resolution program *and* Clay and Lamb's communications specifically with Bayer about it – had no causal link to the employee's invocation or enjoyment of an ADA right would flout the Ninth Circuit's "belief that the ADA's interference provision does not bar any action whatsoever that in any way hinders a member of a protected

class," *Brown*, 336 F.3d at 1193 (citation and quotation marks omitted). On these facts, Neiman Marcus did not violate section 503(b).

**IT IS SO ORDERED.**

Dated: June 19, 2019

THOMAS S. HIXSON
United States Magistrate Judge